**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

CALVIN SHATTO,                   :

                                      :     CIVIL ACTION

             Plaintiff,          :

                                        :

   v.                            :

                                        :     NO. 14-5653

LIBERTY LIFE ASSURANCE     :

COMPANY OF BOSTON,        :

                                        :

            Defendant.       :

**<u>MEMORANDUM</u>**

STENGEL, J.                                       September 26, 2016

       Currently pending before the Court are the Motion for Summary Judgment by Plaintiff Calvin Shatto ("Plaintiff") and the Motion for Summary Judgment by Defendant Liberty Life Assurance Company of Boston ("Defendant"). For the following reasons, Plaintiff's Motion for Summary Judgment is denied, and Defendant's Motion for Summary Judgment is granted.

## I.     FACTUAL BACKGROUND[1]

       Defendant provides long-term disability insurance to employees of Estes Express pursuant to a group disability income policy ("the Policy"). (Def.'s Statement of Material Facts ("DSMF") ¶ 1.)[2] Plaintiff was covered under the Policy through his employment as a truck driver with Estes Express. (Id.)

---

[1] The recitation of facts in this Opinion is compiled from a review of the parties' statements of facts, briefs, and the evidence submitted in conjunction with those briefs.

[2] For ease of reference, the factual background for this Opinion primarily cites to the numbered paragraphs within the Defendant's Statement of Material Facts, and/or to the Bates-numbered pages of the administrative record. Citations to Plaintiff's Response to Defendant's

On May 30, 2012, Defendant received notice of Plaintiff's claim for benefits under the Policy.  (Id. ¶ 2.)  Plaintiff began medical leave from his employment on May 28, 2012 after being involved in a motorcycle accident.  (Id.)  As a result of the accident, Plaintiff suffered multiple injuries, including a head injury, injuries to his back and hip, and a closed pelvic fracture.  (Id. ¶ 3.)

Shortly before Plaintiff exhausted his short-term disability benefits, Defendant began investigating his eligibility for long-term disability benefits under the Policy.  (Id. ¶ 4.)  Based on Plaintiff's date of disability, and taking into account the Policy's 180-day elimination period for long-term benefits, Plaintiff was potentially eligible for long-term disability benefits effective November 26, 2012.  (Id.)  In order to be eligible for long-term disability benefits under the Policy, Plaintiff's conditions must prevent him from performing the material duties of his own occupation during the elimination period as well as the first twelve months of disability.  (Id. ¶ 5.)  Subsequent to that period of time, Plaintiff's conditions must prevent him from performing the material and substantial duties of any occupation.  (Id.)  The Policy defines "any occupation" as "any occupation that the Covered Person is or becomes reasonably fitted by training, education, experience, age, physical and mental capacity."  (Declaration of Paula McGee, July 15, 2015 ("McGee Decl."), Ex. A, Estes Express Disability Policy at LL-0010.)

As part of Defendant's investigation of Plaintiff's eligibility for long-term disability benefits, Defendant received records from Dr. Carol Copeland, an orthopedic surgeon who had performed various surgeries on Plaintiff following the motorcycle accident.  (Id. ¶ 6.)  Defendant also received information regarding the job duties associated with Plaintiff's occupation as a truck driver.  (Id.)  Defendant approved Plaintiff's claim for long-term disability benefits under

---

Statement of Material Facts are included where the disputed fact is relevant to the parties' cross-motions for summary judgment.

the Policy based on Plaintiff's medical records and the job duties information, and notified Plaintiff of its approval of his claim in a letter dated October 23, 2012.  (Id. ¶ 7.)  Defendant continued to request updated medical records from Plaintiff's treating physicians and medical providers, and, based upon those records, Plaintiff continued receiving long-term disability benefits under the Policy.  (Id. ¶ 8.)

On May 29, 2013, Defendant sent Plaintiff a letter reminding him of the Policy's change in definition of "disability" that would occur on November 26, 2013, at which time Plaintiff would have received twelve months of long-term disability benefits.  (Id. ¶ 9.)  In the letter, Defendant advised Plaintiff that it was gathering information to assess his continued eligibility for benefits following the change in definition of disability.  (Id.)  Defendant received various records from some of Plaintiff's treating providers in response to its September 2013 requests for updated medical records, including information from Dr. Copeland, Plaintiff's treating orthopedic surgeon, which indicated that she had not seen or treated him since May 23, 2013. (Id. ¶ 10 (citing LL-0555.)  Based on that information, and the absence of any significant medical data from any other treating physicians, Defendant informed Plaintiff that, effective November 25, 2013, his benefits were discontinued due to the change in definition of disability under the Policy and the absence of any clinical evidence to support a finding that he was unable to perform the duties of any occupation, as defined in the Policy.  (Id.)  In response to the November 25, 2013 letter, Plaintiff submitted an administrative appeal along with updated medical records from Dr. Copeland and other treating physicians.  (Id. ¶ 11.)  On February 19, 2014, Defendant informed Plaintiff that his benefits were being reinstated pending its completion of an administrative review of the additional medical records and an assessment of his eligibility for benefits under the "any occupation" definition of disability.  (Id.)  Defendant also informed

Plaintiff in the February 19, 2014 letter that, while he would continue to receive benefits during its review under the "any occupation" standard, payment of those benefits as well as the payment of any future benefits should not be interpreted as an admission of present or ongoing liability. (Id.)

Following receipt of the updated medical records, Defendant requested a review of the records by an independent physician who was board certified in Physical Medicine and Rehabilitation ("PM&R").  (Id. ¶ 13.)  On March 7, 2014, Defendant received a peer review report completed by Dr. Philippe Chemaly, who is certified in PM&R.  (Id. ¶ 14.)  In his report, Dr. Chemaly summarized the various medical records he had reviewed and expressed an overall opinion that Plaintiff was capable of sustaining full-time work with restrictions and limitations consistent with a sedentary work capacity.  (Id.)  Dr. Chemaly's report included the following:

> Based on my review of the medical documentation, the medical diagnosis noted [in this report], in combination, particularly neck and right hip pain noted with activities, including prolonged sitting, standing, walking and lifting and carrying and reaching, along with mildly antalgic gait, with documentation noting that he does not need any gait aides and is moving and was able to go up and down stairs carrying things, doing work around the house, and getting ready to move and is not taking any more pain medicines, other than occasional Oxycodone[,] with mildly restricted range of motion of the right hip and would translate to the following restrictions and limitations: allowance for symptom-relieving position breaks every hour for 5 to 10 minutes from sitting, standing or walking position; six hours of sitting in an eight hour day; up to two hours a day of standing and walking, but not consecutive; stair climbing occasionally and, again, 5 to 10 minute break between one hour of walking and standing for a total of two hours in an eight hour day.  Lifting, carrying, pushing and pulling would be limited to 20 lbs occasionally with no repetitive lifting, carrying, pushing or pulling.  Reaching below waist and above shoulder would be limited to occasionally.  Reaching between waist and shoulder would be unrestricted.  Squatting, bending and stooping would be limited to occasionally.  Fine motor activities, including grasping, gripping and typing would be unrestricted. Lifting above shoulder would be limited to 5 lbs occasionally with,

again, lifting, carrying, pushing and pulling limited to 20 lbs
occasionally below shoulder and 5 lbs occasionally above shoulder
and based on my review of the medical documentation, these
restrictions and limitations would be applicable for the one year, as
the claimant is continuing to improve and the medical file can be
re-evaluated at that time.

(Id. ¶ 15 (quoting McGee Decl., Ex. B, Administrative Record at LL-0365–LL-0366).)[3]

After receiving Dr. Chemaly's March 7, 2014 report, Defendant forwarded Plaintiff's file
to its vocational rehabilitation department for completion of a transferrable skills analysis and
labor market study.  (Id. ¶ 16.)  On March 13, 2014, Melissa Michuda, a case manager in
Defendant's vocational rehabilitation department, prepared a report which was premised on the
physical restrictions identified in Dr. Chemaly's March 7, 2014 peer review report, as well as
information Plaintiff provided on a training, education, and experience form he submitted as part
of the administrative process.  (Id. ¶¶ 16–17.)  Ms. Michuda identified a number of alternative
occupations consistent with the physical restrictions described in Dr. Chemaly's report, including
scale house operator, documentation billing clerk, assembler (bench), and inspector (bench).  (Id.
¶ 17.)  Plaintiff maintains that the occupations Ms. Michuda identified were not within Dr.
Chemaly's restrictions and limitations because they were not actually sedentary occupations.
(Pl.'s Resp. to DSMF ¶ 17.)

On March 20, 2014, Defendant received a restrictions form from Dr. Copeland which she
had completed on March 13, 2014.  (DSMF ¶ 18.)  Dr. Copeland checked boxes on the form
indicating her opinion that, notwithstanding his physical conditions, Plaintiff was capable of
performing full-time work at a sedentary level, with lifting and carrying up to ten pounds
occasionally; sitting over fifty percent of the time, and standing/walking occasionally.  (LL-

---

[3] Subsequent citation to the administrative record refers only to the "LL" page numbers,
rather than citation to the McGee Declaration.

0313.)  Dr. Copeland's opinion regarding Plaintiff's capabilities was consistent with the restrictions which were listed in Dr. Chemaly's March 7, 2014 report.  (DSMF ¶ 18.)

On March 26, 2014, Defendant issued a determination letter informing Plaintiff that, effective January 26, 2014, it was discontinuing his receipt of long-term disability benefits under the Policy.  (Id. ¶ 19.)  In that letter, Defendant discussed the evidence that was reviewed and received during the course of its administrative review, including the results of Dr. Chemaly's peer review and Dr. Copeland's March 2014 restrictions form.  (Id. ¶ 20.)  Defendant's letter also summarized the results of its vocational department's labor market and transferrable skills analysis report, which had identified alternate occupations that Plaintiff could perform consistent with the restrictions Dr. Chemaly identified.  (Id.)  Finally, Defendant's letter informed Plaintiff of his right to pursue an administrative appeal from the determination to discontinue benefits. (Id.)  Plaintiff disputes that the identified alternate occupations were within the restrictions and limitations Dr. Chemaly identified.  (Pl.'s Resp. to DSMF ¶ 20.)

On April 7, 2014, Plaintiff submitted a handwritten letter appealing Defendant's decision to discontinue his receipt of benefits under the Policy.  (Id. ¶ 22.)  On May 1, 2014, Plaintiff sent Defendant a facsimile containing additional records from Dr. Copeland, including an office visit note reflecting treatment on April 17, 2014; records of x-rays completed on April 17, 2014; and an orthopedic "return to work form" that Dr. Copeland completed on April 17, 2014, in which she stated that Plaintiff was unable to work and had a permanent disability.  (Id.)  Plaintiff added a handwritten note to the return to work form stating that Dr. Copeland was his only treating physician as of that date.  (Id.)  The April 17, 2014 return to work form did not explain the inconsistency with the form Dr. Copeland had previously completed on March 13, 2014, in which she stated that Plaintiff had a full-time sedentary work capacity.  (Id. ¶ 23.)  In a phone

call on May 2, 2014, Plaintiff confirmed that the records he sent the day before were all of the records he intended to submit in support of his appeal.  (Id. ¶ 24.)

Based on the receipt of additional records in support of Plaintiff's appeal, Defendant's disability case manager requested that a nurse case manager in its managed care department review Plaintiff's file, as well as the additional records that Plaintiff submitted.  (Id. ¶ 25.)  On May 5, 2014, Nurse Case Manager Penny Percey ("Nurse Percey") prepared a claim note summarizing the results of her review of Plaintiff's records and file.  (Id.)  Nurse Percey's file note extensively described all of the medical records in Plaintiff's file, and expressed an overall opinion that "the previously stated restrictions from Dr. Chemaly on 3/7/14 are reasonable" and that "the records provided on appeal do not change the previous review."  (Id. ¶ 26 (quoting LL-0068).)  Plaintiff asserts that a nurse is not qualified to give a medical opinion.  (Pl.'s Resp. to DSMF ¶ 26.)

Following Nurse Percey's review, Plaintiff's file was referred to Defendant's appeals review unit for disposition of his appeal.  (DSMF ¶ 27.)  On May 22, 2014, the assigned appeal review consultant referred the file to an independent physician for completion of an independent medical examination, or "IME," by a board certified PM&R physician.  (Id. ¶ 28.)  On July 14, 2014, Defendant received the report of Dr. Steven Morganstein, a PM&R specialist who conducted an IME of Plaintiff on June 27, 2014.  (Id.)  Dr. Morganstein's IME report summarized the various records he reviewed and described his examination of Plaintiff, which had lasted forty minutes.  (Id. ¶ 29.)  Dr. Morganstein noted that he administered a number of provocative tests during Plaintiff's examination, including the Spurling maneuver and the straight leg test, both of which were negative.  (Id.)  Dr. Morganstein noted that there were some abnormalities with respect to both the cervical and lumbar examinations, but that generally the

abnormalities were minor.  (Id.)  Plaintiff denies that the abnormalities were minor, citing Dr.

Morganstein's overall conclusions.  (Pl.'s Resp. to DSMF ¶ 29 (citing DSMF ¶ 30).)  Dr.

Morganstein also administered tests in order to evaluate Plaintiff's grip strength.  (LL-0131.)  Dr.

Morganstein did not observe any significant deficits or muscle spasms during his examination of

Plaintiff.  (DSMF ¶ 29.)  Dr. Morganstein concluded that, although Plaintiff suffered from

impairments which required restricted activities, the impairments would not prevent him from

returning to full-time work in a sedentary position, stating:

> [a]s a result of his injuries and continued symptoms, [Plaintiff] has
> ongoing impairments that limit his ability to stand or walk for
> extended times, perform repetitive activities such as reaching,
> bending, or twisting, and additionally limits his ability to perform
> repetitive lifting or carrying.  His impairments include limitations
> in range of motion in the cervical and lumbar spine as well as at
> the right hip.  He additionally has limitations in strength as well as
> balance.  These impairments result in need for restricted activity
> that, at this point, would be considered permanent.  He does not
> have the capacity to return back to a medium-level job and will
> require restrictions to only sedentary work.  He would, however,
> be capable of working at a full-time sedentary job demand level
> with the ability [to] lift and carry up to 10 pounds on an occasional
> basis to the shoulder level and up to 5 pounds on an occasional
> basis above the shoulder level.  He would be capable of pushing
> and pulling up to 20 pounds occasionally.  He would be restricted
> to performing bending, twisting and squatting on an occasional
> basis only.  There would be no restrictions with regards to use of
> his hands for gripping or grasping.  He would be restricted to
> walking and standing for a maximum of 30 minutes at a time for a
> total of two hours in an eight-hour work day.  He would be able to
> sit for a total [of] six hours in an eight-hour work day with the
> ability to alternate positions for five to ten minutes every hour.

(DSMF ¶ 30 (quoting LL-0182–LL-0183).)  In response to a question regarding any side effects

to Plaintiff's medications, Dr. Morganstein noted that Plaintiff was only rarely utilizing Vicodin,

and that "there are no specific side effects expected that would affect his ability to work."

(DSMF ¶ 31 (quoting LL-0183).)  In response to a question asking whether he agreed with the

assessment of Plaintiff's capacity as noted by his treating physicians, Dr. Morganstein stated

that, based on his review of Plaintiff's records and his exam, he disagreed with Dr. Copeland's

assessment that Plaintiff was disabled from performing any work activities.  (Id.)  Specifically,

Dr. Morganstein stated that:

> [i]t has been indicated in the records from Dr. Copeland that
> [Plaintiff] is totally disabled from performing any work activities.
> I disagree with Dr. Copeland's assessment.  I would agree that
> [Plaintiff] is not capable of returning back to his prior job as a
> tractor-trailer driver; however, as indicated previously I believe
> that he would be capable of performing full-time sedentary work
> with the restrictions stated.

(Id. (quoting LL-0183).)

On July 9, 2014 and July 15, 2014, Plaintiff submitted additional medical records in

support of his appeal.  Defendant had previously received some of the records, but not others.

(DSMF ¶ 32.)  By letter dated July 15, 2014, Defendant informed Plaintiff that, although the

materials were submitted beyond the time periods governing his appeal, Defendant would

consider them and that it had forwarded them for Dr. Morganstein's review in case the additional

records changed any of his previously expressed opinions.  (Id.)

On July 29, 2014, Dr. Morganstein prepared an addendum to his July 14, 2014 report in

which he stated that he had reviewed the additional medical records, but that they did not change

any of the opinions he expressed in that report.  (DSMF ¶ 33.)  Specifically, Dr. Morganstein

stated that:

> [i]t appears from the report of the most recent cervical spine MRI
> from 4/22/2014 that there was been 'slight increase in thecal sac
> narrowing at C4-C5,' otherwise the findings are similar to the prior
> study.  Additionally, the most recent lumbar MRI study report
> dated 6/30/2014 reveals evidence of L1-L2 stenosis and stenosis at
> L3-L4, L4-L5 and L5-S1.  Additionally, there are reports of
> previous studies done of the cervical, thoracic, and lumbar spine.

> After reviewing these reports, my opinions have not changed
> regarding [Plaintiff's] ability to perform limited sedentary work
> activities.  I do not feel there is any need to change the opinions I
> had expressed in the initial independent medical evaluation report.

(Id. (quoting LL-0173).)

After receiving Dr. Morganstein's IME report and addendum, on August 5, 2014,

Defendant sent Plaintiff a letter advising that it was upholding its prior administrative

determination discontinuing Plaintiff's receipt of long-term disability benefits under the Policy.

(DSMF ¶ 34.)  Defendant based its decision on its conclusion that Plaintiff was not suffering

from any condition that would prevent him from performing the duties of the alternate

occupations identified during the administrative review process.  (Id.)  Plaintiff asserts that those

occupations were not within the restrictions and limitations that Dr. Chemaly and Dr.

Morganstein identified.  (Pl.'s Resp. to DSMF ¶ 34.)

Plaintiff filed a Complaint in this case in the Court of Common Pleas of Lancaster

County, Pennsylvania, on August 26, 2014, pursuant to the Employee Retirement Income

Security Act ("ERISA").  Defendant filed for removal of the case to federal court on October 3,

2014.  On October 20, 2014, the case was set for an arbitration hearing in February 2015.  The

parties filed a Joint Motion to Remove Case From Arbitration on January 5, 2015, which this

Court granted on January 14, 2015.  Both Plaintiff and Defendant filed their respective Cross-

Motions for Summary Judgment on July 15, 2015.  Plaintiff filed a Response in Opposition to

Defendant's Motion for Summary Judgment on July 28, 2015 and Defendant filed a Response in

Opposition to Plaintiff's Motion for Summary Judgment on August 5, 2015.  Defendant filed a

Citation of Additional Authority in support of its Motion for Summary Judgment on October 13,

2015.  The parties' Cross-Motions for Summary Judgment are now ripe for judicial

consideration.

## II.     STANDARD OF REVIEW

Summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2).  A factual dispute is "material" only if it might affect the outcome of the case.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  For an issue to be "genuine," a reasonable fact-finder must be able to return a verdict in favor of the non-moving party.  Id.

On summary judgment, the moving party has the initial burden of identifying evidence that it believes shows an absence of a genuine issue of material fact.  Conoshenti v. Pub. Serv. Elec. & Gas Co., 364 F.3d 135, 145–46 (3d Cir. 2004).  It is not the court's role to weigh the disputed evidence and decide which is more probative, or to make credibility determinations. Boyle v. Cty. of Allegheny, 139 F.3d 386, 393 (3d Cir. 1998) (citing Petruzzi's IGA Supermkts., Inc. v. Darling-Del. Co. Inc., 998 F.2d 1224, 1230 (3d Cir. 1993)).  Rather, the court must consider the evidence, and all reasonable inferences which may be drawn from it, in the light most favorable to the non-moving party.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (citing United States v. Diebold, Inc., 369 U.S. 654, 655 (1962)); Tigg Corp. v. Dow Corning Corp., 822 F.2d 358, 361 (3d Cir. 1987).

Although the moving party must establish an absence of a genuine issue of material fact, it need not "support its motion with affidavits or other similar materials negating the opponent's claim."  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  It can meet its burden by "pointing out . . . that there is an absence of evidence to support the nonmoving party's claims."  Id. at 325.  If the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden at trial,"

summary judgment is appropriate.  Celotex, 477 U.S. at 322.  Moreover, the mere existence of

some evidence in support of the non-movant will not be adequate to support a denial of a motion

for summary judgment; there must be enough evidence to enable a jury to reasonably find for the

non-movant on that issue.  Anderson, 477 U.S. at 249–50.

Notably, these summary judgment rules do not apply any differently where there are

cross-motions pending.  Lawrence v. City of Phila., 527 F.3d 299, 310 (3d Cir. 2008).  As stated

by the Third Circuit, "'[c]ross-motions are no more than a claim by each side that it alone is

entitled to summary judgment, and the making of such inherently contradictory claims does not

constitute an agreement that if one is rejected the other is necessarily justified or that the losing

party waives judicial consideration and determination whether genuine issues of material fact

exist.'"  Id. (quoting Rains v. Cascade Indus., Inc., 402 F.2d 241, 245 (3d Cir. 1968)).

## III.   DISCUSSION

After careful consideration, I find the appropriate standard of review for the denial of

benefits in this case is the arbitrary and capricious standard.  I find Defendant's decision to

terminate Plaintiff's long-term disability benefits under the Policy was supported by substantial

evidence and was not arbitrary and capricious.  No reasonable fact-finder would be able to return

a verdict in Plaintiff's favor.  Accordingly, Plaintiff is not entitled to summary judgment on his

ERISA claim, but Defendant is entitled to summary judgment on that claim.  The parties'

arguments regarding which standard of review should apply, as well as the parties' arguments in

support of their respective motions for summary judgment, are each discussed in turn.

### A.   Standard of Review in an ERISA Denial of Benefits Action

In the Complaint, Plaintiff asserted that Defendant does not have discretion to determine

eligibility of benefits or to interpret the terms of the plan, and that he is entitled to a de novo

review of his claim decision.  (Compl. ¶¶ 44–45.)  Plaintiff now agrees that, according to the

Policy, Defendant has discretion to determine eligibility for benefits,[4] and that if Defendant was

the party who made the claims decision, then the appropriate standard of review would be abuse

of discretion.  (Pl.'s Mem. Supp. Mot. Summ. J. 7.)  Plaintiff argues, however, that the de novo

standard of review should apply because Liberty Mutual made the claims decisions, rather than

Liberty Life, and because there is no provision in the Policy which allows delegation of the

authority to handle and decide claims.  (Id.)  Defendant maintains that the Court should apply the

arbitrary and capricious standard in its review of Defendant's decision to terminate Plaintiff's

benefits under the Policy.  (Def.'s Mem. Supp. Mot. Summ. J. 12; Def.'s Resp. Opp'n to Pl.'s

Mot. Summ. J. 2.)

        In Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101 (1989), the United States

Supreme Court held that, when evaluating challenges to denials of benefits in actions brought

under 29 U.S.C. § 1132(a)(1)(B), district courts are to review the plan administrator's decision

under a de novo standard of review, unless the plan grants discretionary authority to the

administrator or fiduciary to determine eligibility for benefits or interpret the terms of the plan.

Id. at 115.  When discretionary authority is given to an administrator of a plan, a deferential

standard of arbitrary and capricious is applied.  Id. at 111; Estate of Schwing v. The Lilly Health

Plan, 562 F.3d 522, 525 (3d Cir. 2009) (abrogated on other grounds, Metro. Life Ins. Co. v.

Glenn, 554 U.S. 105 (2008)).  In such cases, a court may overturn a plan administrator's decision

only if that decision is "without reason, unsupported by substantial evidence or erroneous as a

matter of law."  Pinto v. Reliance Standard Life Ins. Co., 214 F.3d 377, 387 (3d Cir. 2000)

(quotations omitted), abrogated on other grounds, Schwing, 562 F.3d at 525; see also Gillis v.

----

[4] The Policy provides that "Liberty shall possess the authority, in its sole discretion, to
construe the terms of this policy and determine benefit eligibility hereunder."  (LL-0054.)

Hoechst Celanese Corp., 4 F.3d 1137, 1141 (3d Cir. 1993) ("[W]hen the arbitrary and capricious standard applies, the decision maker's determination to deny benefits must be upheld unless it was 'clear error' or 'not rational.'") (internal quotation omitted). "A decision is supported by substantial evidence if there is sufficient evidence for a reasonable person to agree with the decision." Courson v. Bert Bell NFL Player Ret. Plan, 214 F.3d 136, 142 (3d Cir. 2000) (internal citation and quotation marks omitted). Thus, the scope of review under the arbitrary and capricious standard "is narrow, and 'the court is not free to substitute its own judgment for that of the defendants in determining eligibility for plan benefits.'" Doroshow v. Hartford Life & Accident Ins. Co., 574 F.3d 230, 234 (3d Cir. 2009) (quoting Abnathya v. Hoffman–La Roche, Inc., 2 F.3d 40, 45 (3d Cir. 1993)); see also Howley v. Mellon Fin. Corp., 625 F.3d 788, 793 (3d Cir. 2010). By contrast, when a court "exercise[s] de novo review, the role of the court is to determine whether the administrator . . . made a correct decision." Viera v. Life Ins. Co. of N. Am., 642 F.3d 407, 413 (3d Cir. 2011) (citations and quotations omitted). Under the de novo standard of review the "administrator's decision is accorded no deference or presumption of correctness." Id. at 413–14 (citations and quotations omitted).

Plaintiff argues that the de novo standard of review should apply to his ERISA claim because there is no provision in the Policy that authorized Defendant to designate Liberty Mutual to decide claims, and that, therefore, an unauthorized entity made the disability benefits claim decision in his case. (Pl.'s Mem. Supp. Mot. Summ. J. 9.) Specifically, Plaintiff asserts that it was Liberty Mutual that made the claims decision, because (1) Liberty Life has no employees and (2) all the employees who were involved in handling Plaintiff's claim are employed by

Liberty Mutual.  (Id. (citing Pl.'s Mem. Supp. Mot. Summ. J. Ex. A, Affidavit of James R. Pugh, Apr. 7, 2015, ("Pugh Aff.")).)[5]

Defendant Liberty Life is a New Hampshire corporation that is ninety percent directly owned by Liberty Mutual Insurance Company with the remaining ten percent directly owned by Liberty Mutual Fire Insurance Company (collectively, "Liberty Mutual").  (Pugh Aff. ¶ 2.) Liberty Life has a separate board of directors from Liberty Mutual.  (Pugh Aff. ¶ 3.)  Liberty Life also has officers who are either elected by the Liberty Life board of directors or are appointed to their positions by either the chairman or the president of Liberty Life.  (Id.)  Liberty Life maintains financial statements that are separate from those of Liberty Mutual.  (Pugh Aff. ¶ 4.) Liberty Life does not have direct employees.  (Pugh Aff. ¶ 5.)  Pursuant to a service agreement between Liberty Life and Liberty Mutual, Liberty Mutual provides Liberty Life with the services of personnel, equipment, telephones, wire service, computers, and other machines as needed. (Id.)  Liberty Life reimburses Liberty Mutual for the costs of those services, in addition to any other equipment and facilities provided under that agreement, as well as for any other services that Liberty Mutual supplies at Liberty Life's request.  (Id.)  Those personnel assigned to provide services to Liberty Life pursuant to the agreement "generally devote 100% of their time to working for Liberty Life" and "the work performed by them is under the control and ultimate supervision of the officers and board of directors at Liberty Life."  (Pugh Aff. ¶ 6.)  Their work includes investigating claims under the various policies of insurance issued by Liberty Life, and making decisions concerning benefit eligibility under those policies.  (Id.)

---

[5] Plaintiff and Defendant filed a Stipulation in which they agree that, although the Pugh Affidavit was initially filed in another action in the Eastern District of Pennsylvania, it "shall be considered part of the summary judgment record in the instant case, and that it may be considered by the Court in deciding the pending cross-motions for summary judgment."  (Docket Entry No. 26, Stipulation, July 22, 2015 at ¶ 3.)

Defendant argues that, under this arrangement, Liberty Life personnel who worked on Plaintiff's disability benefits claim were working for Liberty Life, while under the direction and control of Liberty Life's officers and directors, notwithstanding the fact that they were paid by Liberty Mutual.  (Def.'s Resp. Opp'n to Pl.'s Mot. Summ. J. 4.)  Robert Dale, a Liberty Life Disability Case Manager, made the determination to discontinue Plaintiff's benefits, which was issued on Liberty Life letterhead and which notified Plaintiff that he could request a review of the denial by addressing the request to Liberty Life—not Liberty Mutual.  (Def.'s Resp. Opp'n to Pl.'s Mot. Summ. J. 4 (citing LL-0307–LL-0311).)  Similarly, Plaintiff's appeal was decided by Janelle Paine, Liberty Life's Appeal Review Consultant.  (Id.)  Ms. Paine's appeal determination was also issued on Liberty Life letterhead.  (Id. at 4–5.)  Defendant argues that Mr. Dale and Ms. Paine acted as representatives and agents of Liberty Life, and that therefore their determinations with respect to Plaintiff's claim were determinations of Liberty Life, and not Liberty Mutual. (Id. at 9.)  Thus, according to Defendant, the arbitrary and capricious standard of review applies to this case, because there was no unauthorized entity involved in handling and deciding Plaintiff's disability benefits claim.  (Id.)

In support of its argument, Defendant points to Lucas v. Liberty Life Assurance Company of Boston, No. 11-4417, slip op. (E.D. Pa. Mar. 28, 2014).[6]  The court in that case rejected an identical argument regarding the relationship between Defendant Liberty Life and Liberty Mutual and how that relationship might affect the standard of review in an ERISA case.

---

[6] Defendant also relies on a Middle District of Pennsylvania case that discussed Lucas in detail and determined that the arbitrary and capricious standard of review should apply to an ERISA claim for long-term disability benefits filed against Liberty Life, because there was no unauthorized delegation of authority to Liberty Mutual.  (See Def.'s Citation of Additional Authority, Ex. A, Cipriani v. Liberty Life Assurance Co. of Boston, No. Civ.A. 12-1335, Report and Recommendation, slip op. at 17–18 (M.D. Pa. Aug. 24, 2015) (Carlson, M.J.); Def.'s Citation of Additional Authority, Ex. B, Cipriani v. Liberty Life Assurance Co. of Boston, No. Civ.A. 12-1335, Order Adopting Report and Recommendation (M.D. Pa. Oct. 9, 2015) (Brann, J.).)

Specifically, the court found that the arbitrary and capricious standard applied because, in spite of the employee pay arrangement, the Liberty Life personnel in that case acted as agents for Liberty Life while under the direction and control of Liberty Life:

> While it is true that the main individuals that were involved in determining whether plaintiff was eligible for benefits received their paychecks from Liberty Mutual, it is apparent throughout the administrative record that those individuals were acting as agents of Liberty Life; sending correspondence on behalf of Liberty Life and ultimately being supervised by Liberty Life.

Lucas, slip. op. at 15.  The court went on to note that there was "no evidence that Liberty Mutual had any involvement in the benefits determination, other than issuing paychecks to the agents of Liberty Life." Id. at 16.

Similarly, in this case Plaintiff has not adduced evidence showing that Liberty Mutual was involved in Liberty Life's processes for benefits determinations other than by issuing paychecks to the personnel assigned to Plaintiff's claim.  Documents in the administrative record show the following: (1) letters to Plaintiff bore the Liberty Mutual logo, but displayed a return address for Liberty Life and were mailed in Liberty Life envelopes (see, e.g., LL-0158–LL-0159); (2) notification to Plaintiff of his appeal rights indicated that such appeals were made to Liberty Life (see, e.g., LL-0167, LL-0197, LL-0456); (3) the telephone extensions for Janelle Paine, the Appeal Review Consultant, and Robert Dale, the Disability Case Manager, matched the general telephone extensions for Liberty Life (see LL-0158, LL-0167, LL-0437);[7] (4) correspondence to Plaintiff from the company coordinating the independent medical examination

---

[7] While Ms. Paine has a Liberty Mutual email address, her signature block states that her position of "Appeal Review Consultant/Group Benefits" is with "Liberty Life Assurance Company of Boston, A Liberty Mutual Company." (LL-0194.)  The fact that Ms. Paine has a Liberty Mutual email address is consistent with the arrangement between the companies that is described in the Pugh Affidavit (Pugh Aff. ¶¶ 5–6), and does not contradict other evidence in the administrative record showing that the personnel handing Plaintiff's claim acted on behalf of Liberty Life.

referred to Liberty Life, not Liberty Mutual (LL-0247);[8] and (5) Plaintiff filed complaints against "Liberty Life Assurance Company of Boston" with the Virginia Bureau of Insurance, among others, which in turn sent correspondence to Liberty Life, not Liberty Mutual.  (LL-0251, LL-0255).

There are other documents in the administrative record that refer to Liberty Mutual, rather than Liberty Life, such as an invoice for the independent medical evaluation.  (LL-0185.) There are also some outgoing facsimile cover sheets that show only the Liberty Mutual logo, but the return facsimile cover sheets provided to the recipient show the Liberty Mutual logo as well as the Liberty Life mailing address and details.  (LL-0327, LL-0328.)  The manner in which an outside company drafted an invoice, or the difference in outgoing and incoming facsimile cover sheets, however, are not sufficient to outweigh the other documents in the administrative record which show that Liberty Life was handling Plaintiff's claim and appeal, consistent with both the terms of the Policy and the arrangement described in the Pugh Affidavit.

Based on the above discussion, I find Liberty Life, not Liberty Mutual, made the benefit determination with respect to Plaintiff's claim for long-term disability benefits, and therefore the appropriate standard of review is the deferential arbitrary and capricious standard.  Under the arbitrary and capricious standard, I will address each of Plaintiff's arguments regarding the termination of his long-term disability benefits under the Policy.

### B. Plaintiff's Claim for Disability Benefits Under 29 U.S.C. § 1132(a)(1)(B)

Plaintiff asserts that Defendant incorrectly terminated his long-term disability benefits and denied his appeal of that decision in a manner that was unfair, biased, and not supported by

---

[8] Ms. Paine was copied on this correspondence as being with "Liberty Mutual," but again, this is not inconsistent with the arrangement described in the Pugh Affidavit.  (See Pugh Aff. ¶¶ 5–6.)

the medical evidence in his case, rendering Defendant's decision arbitrary and capricious. (Compl. ¶¶ 23, 40, 48.)[9]

As stated above, a reviewing court may overturn a plan administrator's decision only if that decision is "without reason, unsupported by substantial evidence or erroneous as a matter of law." Pinto, 214 F.3d at 387. Courts must "review various procedural factors underlying the administrator's decision-making process, as well as structural concerns regarding how the particular ERISA plan was funded, to determine if the conclusion was arbitrary and capricious.'" Miller v. Am. Airlines, Inc., 632 F.3d 837, 845 (3d Cir. 2011) (citing Metro. Life Ins. Co. v. Glenn, 554 U.S. 105, 116–17 (2008); Schwing, 562 F.3d at 525–26). While "'[t]he structural inquiry focuses on the financial incentives created by the way the plan is organized,' i.e., whether there is a conflict of interest, 'the procedural inquiry focuses on how the administrator treated the particular claimant.'" Miller, 632 F.3d at 845 (quoting Post v. Hartford Ins. Co., 501 F.3d 154, 162 (3d Cir. 2007) (abrogated on other grounds, Glenn, 554 U.S. 105)). "A financial conflict arising from the administrator's dual role as evaluator and payor of claims" does not raise the level of scrutiny upon judicial review, but it is "a factor to consider along with other factors in determining whether there has been an abuse of discretion." Morgan v. The Prudential Ins. Co. of Am., 755 F. Supp. 2d 639, 642 (E.D. Pa. 2010) (citing Ellis v. Hartford Life and Accident Ins. Co., 594 F. Supp. 2d 564, 567 (E.D. Pa. 2009)). Third Circuit guidance provides that, "in considering the process that the administrator used in denying benefits," courts may

---

[9] Plaintiff further alleges that Defendant, in addition to ignoring medical evidence from Plaintiff's treating physicians regarding his total disability and inability to perform his or any occupation, failed to conduct a full and fair review as required by ERISA and relied upon provisions not contained within the long-term disability plan in order to deny Plaintiff's claim for benefits. (Id. ¶¶ 41–42.) Plaintiff does not point to any record evidence or make any argument supporting his allegation that Defendant relied on provisions that were not contained in the Policy in order to deny his claim for benefits. Accordingly, I do not address that aspect of the Complaint in this Opinion.

consider "numerous 'irregularities'" to determine 'whether, in [a particular] claimant's case, the administrator has given the court reason to doubt its fiduciary neutrality.'" Miller, 632 F.3d at 845 (quoting Post, 501 F.3d at 165).  Ultimately, the "lawfulness" of the plan administrator's decision is determined "by taking account of several different, often case-specific, factors, reaching a result by weighing all together."  See Miller, 632 F.3d at 845 (quoting Glenn, 554 U.S. at 117).

Plaintiff argues that (1) Defendant operated under a conflict of interest; (2) Defendant erroneously determined that he was capable of sedentary work by ignoring his physician's opinion and by selectively reading his medical records; (3) Defendant's vocational expert identified light duty occupations, rather than sedentary occupations, as alternative occupations for Plaintiff; (4) Defendant refused to accept his treating physician's conclusions and failed to explain why it rejected her opinion; (5) Defendant ignored Plaintiff's self-reported symptoms of pain; and (6) Defendant's termination of long-term disability benefits conflicts with the findings of the Social Security Administration.  I will discuss Plaintiff's argument regarding an alleged conflict of interest in Defendant's administration of the Policy, and then address each of Plaintiff's arguments regarding Defendant's handling of his claim and its termination of his receipt of long-term disability benefits.

### 1.  Conflict of Interest

Plaintiff asserts that Defendant operated under a conflict of interest because it evaluates and pays claims from its own funds.  (Pl.'s Mem. Supp. Mot. Summ. J. 10 (citing LL-0015 (defining "Monthly Benefit" as the "amount payable by Liberty" to the covered person)).) Defendant did not specifically address this argument.

"In a situation where 'a benefit plan gives discretion to an administrator or fiduciary who is operating under a conflict of interest, that conflict must be weighed as a factor in determining whether there is an abuse of discretion.'"  Miller, 632 F.3d at 847 (quoting Firestone, 489 U.S. at 115 (internal citation and quotation omitted)).  Such a conflict arises where the plan administrator plays a "dual role" and acts "as both claim payer and claim evaluator."  Guthrie v. Prudential Ins. Co. of Am., 625 F. App'x 158, 161 (3d Cir. 2015).  The Supreme Court has held that "a reviewing court should consider that conflict as a factor in determining whether the plan administrator has abused its discretion in denying benefits; and that the significance of the factor will depend upon the circumstances of the particular case."  Glenn, 554 U.S. at 108 (citing Firestone, 489 U.S. at 115); see also Feigenbaum v. Merrill Lynch & Co., 308 F. App'x 585, 587 (3d Cir. 2009) (finding that, in a particular case, "'there [was] not a sufficiently close balance for the conflict of interest to act as a tiebreaker in favor of finding that [the plan administrator] abused its discretion.'") (quoting Wakkinen v. UNUM Life Ins. Co. of Am., 531 F.3d 575, 582 (8th Cir. 2008)).

According to the Policy, Defendant is both the evaluator and payor of claims.  Thus, a structural conflict of interest exists.  I will consider this as a factor in determining whether Defendant abused its discretion when it terminated Plaintiff's long-term disability benefits.

## 2.  Plaintiff's Capability for Sedentary Work

Plaintiff asserts that Defendant ignored his treating physician's determination that he was unable to perform sedentary work as of June 2014, and that Defendant "cherry picked" the medical evidence by ignoring the opinions of his doctors.  (Pl.'s Mem. Supp. Mot. Summ. J. 12.) Defendant relies on several arguments in support of its assertion that it did not ignore the

opinions of Plaintiff's treating physicians in reviewing Plaintiff's claim. (Def.'s Resp. Opp'n to Pl.'s Mot. Summ. J. 10–14.)

First, Defendant argues that it "resolved the conflict in the competing medical information by crediting the opinions of the reviewing physicians that [Plaintiff] was capable of returning to work in a sedentary occupation notwithstanding his various physical conditions." (Id. at 12.) As stated above, Defendant obtained opinions from independent physicians who reviewed Plaintiff's medical records and conducted an in-person medical examination of Plaintiff during its handling of Plaintiff's claim. Dr. Chemaly's resulting peer review report includes references to, and discussion of, the opinions and information that Plaintiff's treating physicians provided, as did Dr. Morganstein's July 2014 IME report. In his IME report, Dr. Morganstein agreed with Dr. Copeland that Plaintiff could not return to his prior occupation, but disagreed with her opinion that Plaintiff was totally disabled from performing any work activity. (LL-0204.) Thus, the record evidence shows that, although Defendant and the individuals involved in evaluating Plaintiff did not agree with all of Dr. Copeland's or Dr. Nallapati's opinions, they did not ignore them.

Second, and as noted by Defendant, while plan administrators "may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician," in the ERISA context "courts have no warrant to require administrators automatically to accord special weight to the opinions of a claimant's physician; nor may courts impose on plan administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation."[10] Black & Decker Disability Plan v. Nord, 538 U.S. 822, 834 (2003);

---

[10] Plaintiff asserts that "Liberty's failure to explain why they rejected the opinions of Dr. Copeland is evidence of bias." (Pl.'s Resp. Opp'n to Def.'s Mot. Summ. J. 10.) Plaintiff's argument is not persuasive in light of Black & Decker's clear statement that the plan

see also id. at 834 n.4 ("[F]or the reasons explained in this opinion, we conclude that ERISA does not support judicial imposition of a treating physician rule . . . ."); Nichols v. Verizon Commc'ns, Inc., 78 F. App'x 209, 212 (3d Cir. 2003) (discussing Black & Decker and stating that a plan administrator may be "justified in placing reliance on the opinions of its own consulting doctors and need not provide a special explanation of its decision to do so."). Accordingly, Defendant was not required to give special weight to Dr. Copeland's opinion, nor was it required to resolve the conflicting opinions by following Dr. Copeland's opinion simply because she was Plaintiff's treating physician.  Thus, the mere fact that Defendant did not agree with some of Dr. Copeland's opinions or her final assessment of Plaintiff's work capacity is not evidence that Defendant's decision was arbitrary and capricious.

With respect to Dr. Nallapati, Defendant asserts that it does not appear that he was treating Plaintiff as of March 26, 2014, when Defendant discontinued Plaintiff's benefits effective January 26, 2014.  (Def.'s Resp. Opp'n to Pl.'s Mot. Summ. J. 13 (citing LL-0253).) Defendant bases this assertion on the handwritten note on the medical records that Plaintiff submitted on May 2, 2014, in which he stated that Dr. Copeland "is the only doctor I am seeing at this time."  (Id.)  Plaintiff's medical records indicate that Plaintiff saw Dr. Nallapati on December 4, 2013, at which time Dr. Nallapati stated that Plaintiff was "presently disabled until the end of March 2014" and that further disability would be "determined by orthopedics."  (LL-0450.)  According to a restrictions form that Dr. Nallapati completed on February 21, 2014, he treated Plaintiff on January 31, 2014, and was of the opinion that Plaintiff was not able to work and would not be able to work until approximately six months later.  (LL-0336.)  Dr. Nallapati based his recommended restriction on "reduced range of motion [right] hip" and the fact that

administrator is not required to provide such an explanation.  See Black & Decker, 538 U.S. 822, 834 (2003).

Plaintiff was taking "prescription meds" and had "tried physical therapy." (Id.) Defendant argues that it was not required to defer to Dr. Nallapati's opinions simply by virtue of his status as a treating physician, and also because, unlike Dr. Chemaly and Dr. Morganstein, Dr. Nallapati was not a specialist in pain and rehabilitation medicine. (Def.'s Resp. Opp'n to Pl.'s Mot. Summ. J. 13 n.3 (citing Addis v. Ltd. Long-Term Disability Program, 425 F. Supp. 2d 610, 617 (E.D. Pa. 2006), aff'd, 268 F. App'x 157 (3d Cir. 2008) (stating that deference is not warranted "when the plan's retained consultant is a specialist and the treating physician is a general practitioner.") (internal citation omitted)).) Dr. Chemaly completed his review after Dr. Nallapati last treated Plaintiff, and thus Dr. Chemaly's review included more recent medical records. In addition, Dr. Nallapati's opinion that Plaintiff could not work conflicted with the March 2014 assessment of Dr. Copeland, another of Plaintiff's treating physicians. In light of those facts, Defendant's decision to credit Dr. Chemaly's opinion of Plaintiff's work abilities over that of Dr. Nallapati does not render Defendant's decision arbitrary and capricious.

Finally, Defendant asserts that there were "serious credibility problems associated with Dr. Copeland's opinion" of Plaintiff's work capacity, which contributed to its decision to credit the opinions of Dr. Chemaly and Dr. Morganstein over that of Dr. Copeland. (Def.'s Resp. Opp'n Pl.'s Mot. Summ. J. 13.) Defendant notes that Dr. Copeland completed forms on March 13, 2014 stating that Plaintiff had a sedentary work capacity, but that later—after Defendant informed Plaintiff in a March 26, 2014 letter that his benefits were being discontinued—Dr. Copeland signed the April 17, 2014 and June 12, 2014 forms stating that Plaintiff was unable to work but did not provide an explanation for the change in her opinion. (Id. (citing LL-0313, LL-0241–LL0242).) Plaintiff responds that the change in Dr. Copeland's opinion is justified "because of Plaintiff's symptoms and the MRI." (Pl.'s Resp. Opp'n to Def.'s Mot. Summ. J.

7.)[11]  In support of his argument, Plaintiff relies on the June 12, 2014 forms in which Dr.

Copeland listed Plaintiff's symptoms, described Plaintiff as "permanently disabled," noted

MRI's scheduled for future dates and the possibility of a myelogram with another physician, and

stated that "further surgical intervention" was likely required.[12]  (Pl.'s Resp. Opp'n to Def.'s

Mot. Summ. J. 7–8 (citing LL-0241).)  The March 13, 2014 restrictions form and the April 2014

and June 2014 return to work forms do not describe the same symptoms and conditions, which

_____

[11] Plaintiff describes the findings stemming from the June 30, 2014 MRI as support for Dr. Copeland's change in opinion, but, as Defendant points out, that MRI occurred after Dr. Copeland changed her opinion as to Plaintiff's ability to work.  (Pl.'s Resp. Opp'n to Def.'s Mot. Summ. J. 8 (citing LL-0209); Def.'s Resp. Opp'n to Pl.'s Mot. Summ. J. 13–14.)  While the reasons for ordering the MRI may provide support for Dr. Copeland's opinion that Plaintiff was permanently disabled, Defendant is correct that the actual results of the MRI conducted on June 30, 2014, would not explain why Dr. Copeland changed her opinion as of the dates she completed the "return to work" forms.  (See LL-0208, LL-0241.)

[12] Plaintiff argues that Defendant "dismissed" the fact that he needed additional surgery.  (Pl.'s Mem. Supp. Mot. Summ. J. 14.)  Defendant asserts that the fact that Plaintiff planned to have additional surgery in August 2014 has no bearing on its determination that Plaintiff no longer met the Policy's definition of disability seven months prior on January 26, 2014.  (Def.'s Resp. Opp'n to Pl.'s Mot. Summ. J. 19, 20–21.)

The evidence in the record shows that Plaintiff informed Defendant on July 16, 2014, that he would be having back surgery on August 13, 2014.  (Pl.'s Resp. Opp'n to Def.'s Mot. Summ. J. 5 (citing LL-0191).)  Defendant had determined that Plaintiff no longer met the Policy's definition of disability, under the any occupation standard, as of January 26, 2014.  That determination was made on March 26, 2014 on the basis of (1) Dr. Chemaly's peer review report; (2) Dr. Copeland's restrictions form stating that Plaintiff had a sedentary work capacity; (3) the SSA finding which stated that Plaintiff had a sedentary work capacity; and (4) the transferrable skills analysis report from the vocational expert.  (Def.'s Resp. Opp'n to Pl.'s Mot. Summ. J. 20 (citing LL-0358–LL0367, LL-0313, LL-0598, LL-0316–LL-0317).)  During the appeal of Defendant's determination, Defendant also received Dr. Morganstein's IME report of July 14, 2016, which was updated on July 29, 2014 based on additional records that Plaintiff submitted in July 2014, which also contained information on the scheduled surgery.  (DSMF ¶¶ 32–33; LL-0165.)  Defendant considered the scheduled surgery as part of the appeal determination, noting that while Plaintiff may be incapacitated for a period of time following the surgery, he no longer met the definition of total disability from any occupation under the Policy and had not returned to work at Estes Express, and therefore was not in active employment and would not be eligible for benefits as of the date of the surgery, assuming it took place as scheduled.  (LL-0167.)  Thus, Defendant did not dismiss the fact that Plaintiff was scheduled for surgery, but rather found that the future surgery did not dictate the outcome of the appeal of the initial benefits determination under the terms of the Policy.

prevents a direct comparison of Dr. Copeland's findings.  Nonetheless, it was not irrational or

unreasonable for Defendant to question the change in Dr. Copeland's assessment of Plaintiff's

work capacity, since her opinion of his ability to work changed significantly between March 13

and April 17, 2014.

In sum, the record evidence does not support Plaintiff's assertion that Defendant ignored

his treating physicians' opinions.  Defendant was not required to afford their opinions special

weight in its evaluation of the conflicting medical opinions regarding Plaintiff's work capacity,

nor was Defendant prohibited from assessing the credibility of Dr. Copeland's later assessments

of Plaintiff's work capacity.  Accordingly, this factor does not weigh in favor of finding that the

plan administrator's decision was arbitrary and capricious.

### 3.  Occupations Identified by Liberty Mutual

Plaintiff next argues that Defendant's vocational expert erroneously claimed that the

identified occupations were within the restrictions and limitations that Dr. Chemaly outlined for

Plaintiff, because they are light occupations and not sedentary occupations.[13]  (Pl.'s Mem. Supp.

---

[13] According to Plaintiff, there is evidence of anti-claimant bias in the record because
Defendant ignored staff recommendations regarding his physical capacity.  (Pl.'s Mem. Supp.
Mot. Summ. J. 11; see also Pl.'s Resp. Opp'n to Def.'s Mot. Summ. J. 7.)  Plaintiff relies on a
partial quotation from Post v. Hartford Insurance Co., 501 F.3d 154, 165 (3d Cir. 2007), in
support of his argument that "'[d]isregarding staff recommendations' is evidence of bias."  (Pl.'s
Resp. Opp'n to Def.'s Mot. Summ. J. 7.)

Post states that "disregarding staff recommendations that benefits be awarded" is a
procedural irregularity which might raise suspicion as to the presence of bias in a plan
administrator's decision.  Post, 501 F.3d at 164–65 (internal citation omitted).  Plaintiff's
reliance on Post in support of his bias argument is misplaced for two reasons.  First, Plaintiff has
not identified any instance where Defendant disregarded its staff members' recommendations
concerning the award of benefits, which is the specific procedural irregularity the court in Post
discussed.   Second, the vocational expert did not ignore the medical reports concerning
Plaintiff's work capacity.  Specifically, one of Defendant's vocational experts identified
occupations that, according to the Department of Labor's O*NET job descriptions, fit within the
recommendations and opinions of its medical experts.  (LL-0316–LL-0317.)  The vocational
expert's use of O*NET job descriptions, rather than the DOT job descriptions Plaintiff prefers,
does not mean that the vocational expert "disregarded" medical opinions regarding Plaintiff's

Mot. Summ. J. 11.)  In support of that argument, Plaintiff relies on Dictionary of Occupational

Titles ("DOT") job descriptions for the occupations the vocational expert identified.  (Id., Ex. B.)

Plaintiff asserts that the DOT classifies the occupations of scale house operator, documentation

billing clerk, assembler/bench and inspector/bench as requiring the physical capabilities of light

duty occupations, rather than sedentary occupations.  (Id., Ex. B).  Defendant argues that

Plaintiff may not now raise this issue for judicial review, because he did not present his DOT

argument during the administrative review or appeal process.  (Def.'s Resp. Opp'n to Pl.'s Mot.

Summ. J. 21–22.)

  The Third Circuit "has made clear that the record for arbitrary and capricious review of

ERISA benefits denial is the record made before the Plan administrator, which cannot be

supplemented during the litigation."  Johnson v. UMWA Health & Ret. Funds, 125 F. App'x

400, 405 (3d Cir. 2005); see also Post, 501 F.3d at 168 ("Generally, only evidence in the

administrative record is admissible for the purpose of determining whether the plan

administrator's decision was arbitrary and capricious.") (internal citations omitted), overruled on

other grounds, Doroshow, 574 F.3d 230; Sivalingam v. Unum Provident Corp., 735 F. Supp. 2d

189, 194 (E.D. Pa. 2010) (Where "a plaintiff alleges that a plan administrator . . . abused its

discretion in deciding to terminate benefits, [the Court] generally limit[s] [its] review to the

administrative record, that is, to the 'evidence that was before the administrator when [it] made

the decision being reviewed.'") (quoting Mitchell v. Eastman Kodak Co., 113 F.3d 433, 440 (3d

Cir. 1997))).  Plaintiff did not present evidence of DOT job descriptions during the

administrative proceedings, and he does not cite any other evidence in support of his argument

work capacity.  (See id. at LL-0316 (noting that Dr. Chemaly's physician review report was
reviewed as part of the vocational assessment).)  Accordingly, even if Plaintiff's argument
regarding the vocational expert report and his work capacity were considered, this particular
aspect of that argument would fail.

that Defendant's vocational expert incorrectly identified alternative occupations which Plaintiff

could perform.  Accordingly, I will not consider this argument in support of Plaintiff's motion

for summary judgment.[14]

### 4.   Diagnoses, Restrictions, and Limitations Provided by Plaintiff's Treating Physicians

Plaintiff next argues that, while Defendant accepted Dr. Copeland's diagnoses, it refused

to accept her conclusions about the practical and functional effects of those diagnoses.[15]  (Pl.'s

---

[14] Even if I considered Plaintiff's argument regarding the alternative occupations that Defendant identified, it was not arbitrary and capricious for Defendant to use a vocational report which relied on more current job descriptions from a Department of Labor source rather than those in the DOT, which was last updated in 1991 and, in certain instances, 1998.  (See Def.'s Resp. Opp'n to Pl.'s Mot. Summ. J. 23–24; Def.'s Resp. Opp'n to Pl.'s Mot. Summ. J. Ex. 2, Declaration of Melissa Michuda, July 31, 2015 ("Michuda Decl.") ¶ 4.)  Thus, this factor would not weigh in favor of Plaintiff's claim that Defendant abused its discretion in denying his claim for long-term disability benefits.

[15] Plaintiff asserts that by refusing to accept Dr. Copeland's conclusions, Defendant "'too narrowly constricted the role of a physician' and . . . engaged in 'a selective reading of the medical records that is impermissible.'"  (Pl.'s Mem. Supp. Mot. Summ. J. 13 (quoting Edgerton v. CNA Ins., Co., 215 F. Supp. 2d 541, 551 (E.D. Pa. 2002).)
  Plaintiff's reliance on Edgerton in support of his argument is misplaced.  Defendant correctly notes that Edgerton applied the treating physician rule and predated the Supreme Court's decision in Black & Decker.  (Def.'s Resp. Opp'n to Pl.'s Mot. Summ. J. 17.)  As discussed above, Black & Decker states that, in the ERISA context, "courts have no warrant to require administrators automatically to accord special weight to the opinions of a claimant's physician; nor may courts impose on plan administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation."  Black & Decker, 538 U.S. at 834; see also id. at 834 n.4 ("[F]or the reasons explained in this opinion, we conclude that ERISA does not support judicial imposition of a treating physician rule . . . .").  In addition, Defendant points out that, unlike the facts at issue in Edgerton, Plaintiff's records from Dr. Copeland were reviewed by physicians, as well as a nurse, and that it arranged for an independent medical examination.  (Def.'s Resp. Opp'n to Pl.'s Mot. Summ. J. 17 (citing Edgerton, 215 F. Supp. 2d at 550–551).)
  In accordance with Black & Decker, Defendant was not obligated to credit Dr. Copeland's opinion over the contrary opinions of Dr. Chemaly and Dr. Morganstein.  Thus, the fact that Defendant did not give more weight to Dr. Copeland's opinion than that of the reviewing physicians is not evidence that Defendant selectively read the medical records or constricted Dr. Copeland's role as an evaluator of Plaintiff's abilities.  In addition, the omissions by the plan administrator that were at issue in Edgerton are not present in Plaintiff's case.

Mem. Supp. Mot. Summ. J. 13.)  Plaintiff also criticizes Defendant's failure to provide reasons for its rejection of Dr. Copeland's diagnoses.  (Pl.'s Mem. Supp. Mot. Summ. J. 14.)

A plan administrator may not "arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician."  Black & Decker, 538 U.S. at 834; see also Miller, 632 F.3d at 853 ("An administrator's failure to address all relevant diagnoses in terminating a claimant's benefits is . . . a cause for concern that suggests the decision may have been arbitrary and capricious.").  The plan administrator "need not, however, accord deference to a treating physician's opinion, nor must it explain a decision to credit medical evidence that conflicts with the report of a treating physician."  Creelman v. Carpenters Pension & Annuity Fund of Philadelphia & Vicinity, 945 F. Supp. 2d 592, 604 (E.D. Pa. 2013) (citing Black & Decker, 538 U.S. at 834; Stratton v. E.I. DuPont De Nemours & Co., 363 F.3d 250, 257–58 (3d Cir. 2004).

Plaintiff's argument fails for several reasons.  First, in accordance with Black & Decker, Defendant was not required to automatically accept all aspects of Dr. Copeland's conclusions at the exclusion of any other medical opinion, and it did not "fail" to explain why it credited conflicting medical opinions.  Second, as of the date of Dr. Chemaly's peer review report, there would have been no need to reconcile Dr. Copeland's opinion about Plaintiff's work capacity with that of Dr. Chemaly, because at that time Dr. Copeland had stated that Plaintiff had a sedentary work capacity.  (Def.'s Resp. Opp'n to Pl.'s Mot. Summ. J. 17 (citing LL-0313).)  Third, the administrative record shows that the change in Dr. Copeland's opinion of Plaintiff's ability to work prompted Defendant to have Plaintiff's records reviewed by a nurse case manager and referred to an independent physician for an independent medical examination.  Thus,

---

Accordingly, this aspect of Plaintiff's argument regarding the records submitted by his treating physicians is not persuasive.

Defendant did not "refuse to accept" Dr. Copeland's conclusions about Plaintiff's work capacity—rather, it sought additional opinions and subsequently relied on them as part of its determination.  Fourth, and as discussed previously, Defendant's expert physicians did not ignore Dr. Copeland's opinions, but instead they thoroughly reviewed them and their reports discussed them in detail.

In light of the above discussion, Defendant's decision to credit Dr. Morganstein's opinion that Plaintiff was capable of sedentary work, rather than Dr. Copeland's opinion that Plaintiff was precluded from doing any type of work, was not arbitrary and capricious.  Accordingly, this factor does not weigh in favor of Plaintiff's claim that Defendant abused its discretion in denying long-term disability benefits.

### 5.  Plaintiff's Self-Reported Symptoms

According to Plaintiff, Defendant and its expert physicians ignored his symptoms and the effect that they would have on his ability to perform his job duties, and none of the expert reports addressed whether he could perform those duties while experiencing pain that he described as "7" on scale of one to ten.  (Pl.'s Mem. Supp. Mot. Summ. J. 15 (citing LL-0117).)  Plaintiff also argues that Defendant and its expert physicians "failed to analyze" whether he could perform the duties of the jobs identified by the vocational expert in light of "the actual symptoms that he complained of, pain in his pelvis, neck and hips," and that such failure suggests that the termination of his benefits "'was not reasoned and based on an individualized assessment' of [his] abilities."  (Id. (quoting Heim v. Life Ins. Co. of N. Am., No. Civ.A.10–1567, 2012 WL 947137, *12 (E.D. Pa. Mar. 12, 2012) (quoting Loomis v. Life Ins. Co. of N. Am., No. Civ.A.09–3616, 2011 WL 2473727, *5 (E.D. Pa. June 21, 2011)).)  Defendant responds that Dr. Chemaly and Dr. Morganstein are specialists in pain medicine, and that they would have taken

Plaintiff's pain complaints into account when rendering their opinions.  (Def.'s Resp. Opp'n to Pl.'s Mot. Summ. J. 15.)

Contrary to Plaintiff's assertion, Dr. Chemaly and Dr. Morganstein both recognized that there were restrictions in Plaintiff's abilities due to issues with pain.  Dr. Chemaly's report and his recommended restrictions considered, and were based in part on, (1) Plaintiff's "neck and right hip pain noted with activities;" (2) the fact that Plaintiff was "not taking any more pain medicines, other than occasional Oxycodone; and (3) the fact that, based on Dr. Chemaly's review of Plaintiff's medical records, Plaintiff was "continuing to improve."  (LL-0365–LL-0366.)

Dr. Morganstein also took Plaintiff's pain into account when preparing his IME report. Specifically, Dr. Morganstein's IME report showed that (1) he told Plaintiff to tell him if he experienced pain or discomfort during the examination; (2) he performed tests and maneuvers that are specifically intended to determine the presence of pain or discomfort, all of which were negative; (3) he noted the areas of Plaintiff's body where there was tenderness on palpation; (4) they discussed Plaintiff's complaints of pain, including his description of a "constant 'nagging'" pain in the hips and right leg that he rated as "7/10;" (5) he noted that Plaintiff's medical history showed that he continued to experience chronic pain but that Plaintiff reported "only rarely" using hydrocodone; (6) he noted that the more recent medical records indicated that Plaintiff required very little pain medication and that Plaintiff "reports again that he does not take any medications for pain on a regular basis and only rarely requires use of Vicodin;" and (7) at the examination, Plaintiff complained of "persistent pelvic pain" as well as pain in his hips, pain down the upper part of his right leg, soreness in his groin muscles, and occasional pain at his left shoulder, but also indicated that overall his neck pain was "better" and "improved" and that he

31

did not have any pain in his right foot.  (LL-0127, LL-0130–LL0133).)  Thus, Dr. Morganstein's report shows that he considered Plaintiff's self-reported pain symptoms as well as documentation in Plaintiff's medical records regarding pain and the results of the tests he performed during his examination of Plaintiff.  Plaintiff relies on <u>Heim</u> for the proposition that "[a] plan administrator cannot refuse to consider subjective reports of pain[,]" but Defendant did not refuse to consider Plaintiff's self-reported pain—rather, Dr. Morganstein diligently noted Plaintiff's self-reported symptoms of pain—as well as Plaintiff's self-reported improvements with regard to pain—and took those factors into consideration when describing his opinion of Plaintiff's impairments, his need for restricted activity, and the types of work that Plaintiff could no longer do along with those that he could do in light of those impairments and restrictions.

In sum, the record evidence indicates that Defendant and the expert physicians involved in the review of Plaintiff's claim did not ignore his self-reported symptoms of pain, but rather documented them in great detail and considered them alongside the other medical records in Plaintiff's file.  Defendant's handling of Plaintiff's self-reported symptoms was not unreasonable, but rather was based on an individualized assessment of his abilities, and thus was not arbitrary and capricious.  Accordingly, this factor does not weigh in favor of Plaintiff's claim.

### 6.  Findings of the Social Security Administration

Defendant asserts that its determination that Plaintiff had a sedentary work capacity is supported by the decision rendered by the Social Security Administration ("SSA") regarding Plaintiff's application for social security disability benefits.  (Def.'s Mem. Supp. Mot. Summ. J. 16.)  Specifically, Defendant argues that the SSA findings, which state that Plaintiff had a

sedentary work capacity, are virtually identical to the restrictions and limitations that Dr.

Chemaly and Dr. Morganstein recommended.  (Id. at 16–17.)

The SSA issued its decision as to Plaintiff's application on June 24, 2013, finding that

Plaintiff was eligible for social security disability benefits.  (LL-0586–LL-0601.)  The SSA

opinion included the following factual findings regarding Plaintiff's residual physical capacity:

> The claimant has the residual functional capacity to perform
> sedentary work as defined in 20 C.F.R. 404.1567(a).  He can lift,
> carry, push, and pull 10 pounds occasionally and items such as
> ledgers and files frequently.  He requires a hand-held assistive
> device for ambulation.  He can sit without restriction.  He can only
> occasionally operate hand or foot controls due to weakness and/or
> decreased sensation in both hands, his right hip and his right ankle
> and foot.  He can occasionally stoop with caution, climb stairs
> using a handrail and bend slightly, but he can never kneel, crouch
> or balance.   He cannot fully elevate his arms and can only
> occasionally perform handling due to clumsiness, weakness and
> decreased sensation in both hands, worse on right.

(LL-0598.)

"An ERISA administrator need not defer to or always reconcile its own decision

regarding an applicant's disability with a disability determination by the SSA."  Creelman, 945

F. Supp. 2d at 605 (citing Goletz v. Prudential Ins. Co. of Am., 383 F. App'x 193, 198 (3d Cir.

2010)).  "Nevertheless, deviation from the SSA's determination or failure to consider a SSDI

award is a factor to be considered in determining whether a denial of benefits was arbitrary and

capricious."  Creelman, 945 F. Supp. 2d at 605 (citing Post, 501 F.3d at 167); see also

Brandeburg v. Corning Inc. Pension Plan for Hourly Employees, 243 F. App'x 671, 674 n.3 (3d

Cir. 2007) ("While an SSA award may be considered as a factor in determining whether an

ERISA administrator's decision to deny benefits was arbitrary and capricious, it "'does not in

itself indicate that an administrator's decision was arbitrary and capricious, and a plan

administrator is not bound by the SSA decision.'") (quoting <u>Dorsey v. Provident Life & Accident</u> <u>Ins. Co.</u>, 167 F. Supp. 2d 846, 856 n.11 (E.D. Pa. 2001)).

      Plaintiff argues that the SSA decision does not support Defendant's determination, because SSA found that Plaintiff's "physical conditions are severe impairments within the meaning of the Social Security Act because . . . they cause more than minimal limitation in the claimant's ability to perform basic work activities on a sustained basis."  (Pl.'s Resp. Opp'n to Def.'s Mot. Summ. J. 9 (citing LL-0598).)  As Defendant points out, however, the plan administrator makes decisions as to benefits eligibility in accordance with the terms of the Policy, not on the basis of guidelines for the award of social security benefits.  (Def.'s Resp. Opp'n to Pl.'s Mot. Summ. J. 20 n.7; LL-0166.)

      Plaintiff also asserts that Defendant's determination conflicts with the SSA decision, which states that "[c]onsidering the claimant's age, education, work experience, and residual functional capacity, there are no jobs that exist in significant numbers in the national economy that the claimant can perform."  (<u>Id.</u> (citing LL-0600).  Defendant argues that because SSA guidelines consider age in addition to residual physical capacity, they do not control the outcome of a benefits determination pursuant to the terms of a particular benefits policy.  (Def.'s Mem. Supp. Mot. Summ. J. 17 n.3 (citing <u>Williams v. Metro. Life Ins. Co.</u>, No. Civ.A. 08-1478, 2010 WL 936147, at *8 (D.N.J. Mar. 12, 2012) ("The standards governing disability determinations under the Social Security Act and those under ERISA differ, and an ERISA plan administrator is not bound by a determination of disability under the Social Security Act.") (citing <u>Black &</u> <u>Decker</u>, 538 U.S. at 829–32; <u>Pokol v. E.I. du Pont de Nemours and Co., Inc.</u>, 963 F. Supp. 1361, 1379 (D.N.J.1997))).)  Here, however, the Policy defines "any occupation" as "any occupation that the Covered Person is or becomes reasonably fitted by training, education, experience, age,

physical and mental capacity."  (McGee Decl., Ex. A, Estes Express Disability Policy at LL-0010.)  Because the Policy also considers age as a factor in determining whether a particular claimant is capable of working in "any occupation" as opposed to the claimant's "own occupation," Defendant's argument regarding the difference in SSA guidelines versus policy terms is not persuasive with respect to that particular aspect.

Nonetheless, in this case it was not arbitrary and capricious for Defendant to determine that Plaintiff was capable of sedentary work in "any occupation" pursuant to the terms of the Policy.  Defendant's final appeal denial letter noted that the SSA award had been considered, but that it had reached a different conclusion from the SSA, in part because Defendant had access to Plaintiff's more recent medical information, and in part because of the contents of the vocational report, items which were not presented to the SSA.  (LL-0166).  Ultimately, Defendant was not required to defer to the SSA's decision in reaching its conclusion.  Thus, while deviation from an SSA determination is a factor that must be considered, under the circumstances of this case it does not weigh in favor of Plaintiff's claim.

### 7.  <u>Weighing the Factors in Plaintiff's Case</u>

"To decide whether an administrator's termination of benefits is arbitrary and capricious, [courts] 'determine lawfulness by taking account of several different, often case-specific, factors, reaching a result by weighing all together.'"  <u>Miller</u>, 632 F.3d at 855 (quoting <u>Glenn</u>, 554 U.S. at 117).  Here, while there is a structural conflict of interest due to Defendant's dual role as claims evaluator and payor, the procedural factors, *i.e.* the way Defendant handled Plaintiff's benefits claim, show that Defendant's decision was not arbitrary and capricious.  Defendant's determination was supported by substantial evidence with respect to (1) Plaintiff's capability for sedentary work; (2) the existence of alternative occupations consistent with a sedentary work

capacity; (3) Defendant's consideration of the diagnoses, restrictions, and limitations provided by Plaintiff's treating physicians; (4) Defendant's consideration of Plaintiff's self-reported symptoms of pain; and (5) the reasons that Defendant's determination differed from the Social Security Administration's disability finding.  When all of these factors are weighed together, it is apparent that Defendant's decision was supported by substantial evidence, and therefore was not arbitrary and capricious.

## IV.   CONCLUSION

In light of the foregoing, I find Plaintiff has not established that he is entitled to summary judgment on his ERISA claim.  Therefore, I must deny Plaintiff's Motion for Summary Judgment.  By contrast, I find Defendant has established its right to summary judgment and that no reasonable jury would find in Plaintiff's favor.  Accordingly, Defendant's Motion for Summary Judgment is granted.

An appropriate Order follows.